## St. Louis, Iron Mountain & Southern Railway Company *v.* Lawrence.

### Opinion delivered December 9, 1912.

1. RAILROADS—DUTY OF ENGINEER TO SLOW DOWN.—A railway engineer is under no duty to slow down his engine, when he sees a railway employee ahead of him, who has removed his speeder from the track and is standing on the right-of-way in a place of safety. (Page 37.)

2. RAILROADS—NEGLIGENCE—INJURY TO EMPLOYEE.—Where the deceased, who was an employee of a railway company, and who had been riding a speeder, and removed the same from the track upon the approach of a train, and without warning returned to the track to remove a jack therefrom, and was struck by a fast-moving engine and killed, the engineer was under no duty to check the speed of the train, and was not guilty of negligence in failing to do so, because he had no way of knowing that deceased, who was in a place of safety would return and attempt to go upon the track. (Page 38.)

Appeal from Saline Circuit Court; *W. H. Evans,* Judge; reversed.

*E. B. Kinsworthy, H. S. Powell, R. E. Wiley* and *W. G. Riddick,* for appellant.

1. The law applicable to this case is clearly stated in 46 Ark. 513. As to the duty of employees of railroads and negligence see 84 Ark. 270; 98 *Id.* 224; 90 *Id.* 403; Elliott on Railroads, § 1298; 97 Ark. 560.

2. No peril was discovered to employee, and until discovered the company was under no duty to act. 99 Ark. 560; Bailey on Personal Inj., vol 2, § 497; 83 Wis. 459; 170 Mass. 168.

3. Where a person * * * has actual knowledge of the approach of a train in time to avoid it and fails to do so, he is guilty of contributory negligence. 30 Gratt. (Va.) 805; 150 U. S. 245; 64 Ohio St. 458.

4. In the absence of a statute or ordinance no rate of speed is negligence, *per se.* 34 Col. 380; *Ryles* v. *Ferrell, supra.*

5. The burden was on plaintiff to establish the fact that the trainmen discovered deceased's peril in time to avoid the accident. 97 Ark. 560; 77 *Id.* 401.

6. It is reversible error to give an instruction not based on the evidence. 97 Ark. 11; 76 *Id.* 348; *Ib.* 602; 96 *Id.* 614; 70 *Id.* 441.

7. It was error to submit to the jury the question of defendant's negligence at a time before deceased cleared the track.   75 Ark. 76; 63 *Id.* 177; 70 *Id.* 441.

8. There was error in the court's charge.   69 Ark. 134.

*Mehaffy, Reid & Mehaffy,* for appellee.

1. Increased speed of a train calls for increased diligence. 63 Ark. 177, 185-6.

2. Negligence on the part of the trainmen was the proximate cause of the injury.   132 N. Y. S. 1039; 133 N. W. 23; 80 S. W. 1032; 19 *Id.* 284.   Two negligent acts may concur to produce a proximate cause.   133 N. W. 23; 80 S. W. 1032; 19 S. W. 284; 28 N. E. 446; 68 Ark. 607.

3. The question of contributory negligence was for the jury.   52 Pac. 441; 59 Am. Rep. 463; 78 N. W. 722; 67 *Id.* 447; 6 So. Rep. 690; 112 Ill. App. 323; 14 Minn. 57; 28 N. E. 172. '

4. The burden of proof as to the discovery of peril in time to avoid injury and failure to use proper means was on the railway company.   99 S. W. 81; 98 *Id.* 231; 90 *Id.* 543; 93 *Id.* 88.

5. There is no error in the charge to the jury.   147 S. W. 50.

6. Expert evidence properly admitted.   16 Ohio. 204; 84 N. W. 960; 98 Ark. 352; 77 *Id.* 427.

SMITH, J.   The appellee, Mrs. Frankie Lawrence, as administratrix of the estate of I. D. H. Lawrence, deceased, sued the appellant railway company for the benefit of herself, as his widow, and their children, who were his next of kin. The jury returned a verdict in her favor in the sum of $5,000, and the railway company appealed from the action of the court in awarding her judgment for that amount.

The complaint alleged, and the proof showed, that the deceased at the time of his death was employed by the railway company as a section foreman and that he had been employed in section work for twenty-one years preceding his death and for the last sixteen years of that time had been a section foreman.   That on January 7, 1911, while so employed he was struck and killed by an engine running at the rate of

from forty-five to fifty-five miles per hour, and which had no cars attached to it.

The facts in the case stated as favorably to the plaintiff's contention as the evidence will warrant are these: That on the day he was killed, Mr. Lawrence worked at the south end of his section which joined that of one R. L. Patterson, who was also a section foreman, and that Mr. Lawrence rode to the end of his section on his speeder, but was not accompanied by his men. Mr. Patterson borrowed this speeder and went to Benton and during his absence, Lawrence stayed with the section men, and remained there until Patterson returned, when they ate dinner together. The men working under Mr. Patterson had eaten their dinner some distance north of the place where they had been engaged in cutting over the right-of-way and they started back to their work about 1:30 P. M. walking, when Patterson called to them to take the hand car. When this order was given, the men began to execute it and while so employed, the engine, which later struck Mr. Lawrence was heard to whistle for Traskwood, a station on the line of defendant's road. Patterson said to his men that they could go as far with their car as they wanted to go before the train passed and as Mr. Lawrence put his speeder on the track, he remarked that he, too, would go up the track a piece and set the speeder off. The men separated those on the hand car with Patterson going to the south meeting the engine while Mr. Lawrence rode away on his speeder in the direction in which the engine was coming. Each had traveled about 500 feet, and, when they had gotten about 1,000 feet apart, they stopped and began to get the hand car and speeder from the track and both were placed entirely in the clear on the right side of the track, which was the side on which the engineer rides on his engine. Mr. Patterson crossed over to the left or the west side of the track and stood there in a place of safety, but his men stood on the right side of the track where their car was, and, as has been stated, they were 1,000 feet nearer the approaching engine than Mr. Lawrence was. Patterson's car was removed from the track before Lawrence had succeeded in removing his speeder, but the speeder was removed entirely in the clear before the train passed, its wheels nearest the track being from four to six feet from the

track. This track appears to have been level and to have had but little elevation above the ground. The work of removing the speeder was completed while the engine was a distance from the speeder, variously estimated, from three to five telegraph poles and the witnesses agreed that after removing the speeder, Lawrence stood, for some appreciable length of time, watching the approaching engine, but they differ as to the length of time during which he stood observing it. He was then seen to start from the east to the west side of the track and there was evidence which tended to show that near the center of the track or at the west rail he stooped as if to pick up something from the track and the conductor, who was riding on the seat with the engineer, testified that Lawrence went rapidly across the track and appeared to bend over as he went and that he stooped over from the outside west rail as if to pick something from the track, but that the only thing he saw between the rails, or which was found there after the train had stopped, was a leveling board, which was lying between the rails south of the body.

The engineer denied having seen anything on the track or to have noticed anything about Lawrence's posture except that he was going rapidly across the track, and he stated that there was ample time for him to have done so, but that in any event he could not have appreciably reduced the speed of his train after Lawrence started across the track before passing the point where he had been standing. The engineer swore that when Lawrence crossed over to the left side of the track, he passed out of his view and the evidence seems to be undisputed that the engineer could not see the left-hand rail at a point less than sixty feet in front of his engine and he says that he did not know that he had struck Mr. Lawrence until the fireman called to him that he had done so. The evidence is conflicting as to whether Lawrence had safely crossed to the west side of the track. The brakeman, who was riding in the fireman's seat and who was probably the only person who actually saw the impact, testified that Lawrence had gotten in the clear on the west side, when he turned and stooped over the rail and that he was struck as he was rising to an erect position. This statement is corroborated by the physical fact that blood and brains were found on the left end of the pilot beam and

that this beam was the widest part of the engine. There was evidence, however, from which the jury might have inferred that Lawrence was between the rails and had not crossed entirely over when he was struck, and we assume this to be true. The engine which was of the largest type in the passenger service, was stopped within about one-fourth or one-half of a mile and returned to the scene of the injury, where it was found that Lawrence had been decapitated by being struck by the engine's pilot beam. The plaintiff insists that Lawrence was reaching down to remove a track jack which weighed about thirty or forty pounds from the west rail and was just in the act of doing so when he was struck. The trainmen all deny having seen the jack either on the track or elsewhere but it appears that after the engine left the section men found the jack about fifteen or twenty feet from the track with blood and brains on it and lying north of Lawrence's body. The plaintiff insists that the jack was in a position on the track to endanger the safety of the engine and the persons riding on it, or at least that it so appeared to the deceased in the emergency under which he was called upon to act; and a number of instructions were given defining the law where one acts in an emergency to save life or property. There was also much evidence offered on the part of plaintiff by engineers claiming to be experts in the operation of trains, defining the duty of an engineer to persons on the track, and the distance in which a train might be stopped at given rates of speed, and a number of instructions were given defining the law of that situation. In our view of this case it is unnecessary to review this evidence or to discuss these instructions.

The proof does not show anything about the position of the jack and it is only by inference that the jury might have found that it was on the track and in a position to endanger the safety of the engine and its occupants. Therefore, even if it be conceded that the jury was warranted in finding and that Lawrence acted in an emergency and to avoid what appeared to him to be an impending danger, under such circumstances as that he was not chargeable with contributory negligence in so doing, we are still of the opinion that he can not recover under the facts in this case. But we are of the opinion in the first place that he was not excused for having

his speeder on the track. Before leaving the crossing, where he separated from Patterson, he knew of the approach of the train and that it would pass him without stopping. He knew what tools there were on his speeder and he must have known that it would require that much more time to remove them than if they could be removed with the speeder; and he knew, too, that it would require time to place his speeder on the track and to remove it, and with this knowledge, when he knew that the train was only two miles from him, he started with his back to the engine in the direction in which it was going. When he had gone about 500 feet he stopped and removed his speeder and the undisputed proof is that he had placed it, and was himself, in a position of absolute safety. Under these circumstances the engineer was under no duty to stop his train nor even to check its speed. He had the right to suppose that the men using the car and the speeder were employees of the railway company, charged with the duty of being aware of the approach of the train. Nor was there anything in the conduct of the parties nor in their situation which would have indicated that they were unaware of the approaching train and insensible to their danger; on the contrary, the undisputed evidence is that they were aware of the engine's approach and so far as the engineer could know they had gotten into a place of safety. Expert engineers testified upon the part of the plaintiff that it was the duty of the engineer in charge of a train to have gotten his engine under control when persons were seen on the track, whose safety might be endangered by the train not being under control. Appellee contends that the engine should have been put under control; that its speed should have been so reduced that by application of the air, the train could have been stopped or its speed reduced, when it was seen that Lawrence was stooping over the track as if to remove something from it, and instructions were given declaring the law to that effect. This would be the law if it appeared that there was anything in the situation of the persons upon the track which made it appear that they were unaware of the danger of their situation. But there was no such duty here. All the persons on the track were section men whose business it was to make the track safe for the passage of trains and who were charged with notice that

trains might run at any time, and it not only appeared to the engineer that they were all aware of the approaching engine, but such was actually the fact, and both cars were removed to a place of safety.

It is not contended by plaintiff that the engine could have been stopped after Lawrence started across the track, but appellee's contention is that if the train had been under control, it could have been slowed down while running the 100 or 125 yards, intervening between it and deceased when he started across the track, and that the additional time consumed in running that distance if the air had been applied to this engine while it was under control, would have so nearly stopped the train that Lawrence's safety would thereby have been secured. But we have just shown that there was nothing in the situation which required the engineer to check his speed at any time, when to have done so would have avoided the injury. Up to the time when the train was within 100 to 125 yards of Lawrence there was nothing to require the engineer to check his speed, and before we can say that he was guilty of any negligent act, it must appear that he failed to perform some duty owing by him to take precaution for Lawrence's safety; and no witness says that the train could have been stopped in the 100 to 125 yards that intervened between the engine and Lawrence when he started across the track. It appears to us that if Lawrence was called upon to act in an emergency, it was of his own unnecessary creation, but as has been said, even though it should be held that the circumstances under which he acted, and the purpose for which he acted, were such that a jury might have found that his action was not a negligent one, we must still hold that the engineer was guilty of no negligence towards Lawrence until he breached some duty which he owed him, and there is no evidence here that he had any knowledge that Lawrence would attempt to remove the jack from the rail, even though in fact he did attempt to do so.

The questions here discussed are applications of well known rules and the principles are fully discussed in the cases referred to below and in the citations there contained. *St. Louis & S. F. Rd. Co.* v. *Newman*, 151 S. W. 255; *St. Louis & S. F. Rd. Co.* v. *Ferrell*, 84 Ark. 270; *St. Louis, I. M. & S. Ry. Co.*

v. *Wilkerson,* 46 Ark. 513; *St. Louis, I. M. & S. Ry. Co.* v. *Rains,* 90 Ark. 398; *St. Louis, I. M. & S. Ry. Co.* v. *Watson,* 97 Ark. 560.

The case appears to have been fully developed and is accordingly reversed and dismissed.